IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WENDY LEICHTER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI,[1] Acting | : | NO.  20-6147 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                    December 13, 2021

Wendy Leichter ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) to review the Commissioner's final decision denying her application for disability insurance benefits ("DIB").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and remand for further proceedings pursuant to sentence four of section 405(g).

## I.    **PROCEDURAL HISTORY**

Plaintiff applied for DIB on August 30, 2018, alleging disability beginning on September 16, 2017.  Tr. at 84, 147, 193.[2]  The application was denied initially, id. at 87-91, and Plaintiff requested an administrative hearing before an ALJ.  Id. at 92-93.  An

---

[1]Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi should be substituted for the former Commissioner of Social Security, Andrew Saul, as the defendant in this action.  No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

[2]For purposes of DIB eligibility, Plaintiff's date last insured (DLI) is March 31, 2022.  Tr. at 70, 193; see 20 C.F.R. § 404.101(a).

administrative video hearing took place on September 4, 2019.  Id. at 32-69.  On

December 27, 2019, the ALJ issued an unfavorable decision, finding that Plaintiff was

not disabled.  Id. at 10-20.  The Appeals Council denied Plaintiff's request for review on

October 20, 2020, id. at 1-6, making the December 27, 2019 ALJ decision the final

decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on May 2, 2021.  Doc. 1.  The

matter is now fully briefed and ripe for review.  Docs. 6, 7 & 8.[3]

## II.   <u>LEGAL STANDARD</u>

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.      Whether the claimant is currently engaged in
> substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment"
> that significantly limits her physical or mental ability to
> perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the
> impairment meets or equals the criteria of an impairment
> listed in the listing of impairments ("Listings"), 20 C.F.R. pt.

---

[3]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  <u>See</u> Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 4.

404, subpt. P, app. 1, which results in a presumption of disability;

4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

5.      If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through

four, while the burden shifts to the Commissioner at the fifth step to establish that the

claimant is capable of performing other jobs in the local and national economies, in light

of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec.,

474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusion that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552

(3d Cir. 2005)).

3

III.   **DISCUSSION**

Plaintiff was born on February 14, 1956, and was sixty-one years of age at the alleged onset date (September 16, 2017) and sixty-three on the date of the ALJ's decision (December 27, 2019). Tr. at 147, 193. Plaintiff is 5' 2" tall and weighs between 200 and 223 pounds. Id. at 183, 420. She completed the twelfth grade and has no specialized job training. Id. at 65, 184. Plaintiff is divorced and has two children, although her children do not live with her. Id. at 207, 420. She has past relevant work experience from January 2004 to December 2008 as a jewelry sales clerk, and from January 2010 to August 2018 as a cashier in a grocery store. Id. at 64, 185, 199. Plaintiff has not engaged in substantial gainful activity ("SGA") since September 16, 2017, the alleged onset date. Id. at 12, 184.[4]

   A.   **ALJ's Findings and Plaintiff's Claim**

In the December 27, 2019 decision under review, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since September 16, 2017, her alleged onset date. Tr. at 12. At step two, the ALJ found that Plaintiff suffers from severe impairments of status post avulsion fracture of the right shoulder and degenerative changes, hypertension, obesity, disorder of the autonomic nervous system, atrial fibrillation, degenerative changes of the spine, and small hiatal hernia. Id. The ALJ further found that Plaintiff's mental impairments of depression, anxiety, and panic

_____

[4]The ALJ explained that Plaintiff's quarterly earnings from her grocery store cashier job after September 16, 2017, did not reach SGA levels. Tr. at 12.

disorder are not severe.  Id. at 13.  At step three, the ALJ found that Plaintiff does not

have an impairment or combination of impairments that meets or equals the Listings.  Id.

at 14.  The ALJ determined that Plaintiff has the residual functional capacity ("RFC") to

perform light work as defined in 20 C.F.R. §404.1567(b), except that she can

occasionally push and or pull with her right upper extremity; occasionally climb ramps

and stairs, balance, stoop, kneel, and crouch; cannot climb ladders, ropes, and scaffolds

or crawl; cannot reach overhead with her right upper extremity; and cannot work around

unprotected heights or operate hazardous machinery.  Id. at 15.  The ALJ found at step

four that Plaintiff is capable of performing her past relevant work as a jewelry sales clerk,

id. at 19, and is therefore not disabled.  Id. at 20.[5]

Plaintiff presents a single claim, arguing that remand is required because the ALJ

at step four failed to account for the impact of Plaintiff's mild mental limitations on her

ability to perform her past relevant work as a jewelry sales clerk.  Doc. 6 at 2.  Defendant

counters that the ALJ's decision is supported by substantial evidence.  Doc. 7 at 1.

**B.      Summary of the Medical Evidence[6]**

Plaintiff initially alleged disability due to chronic pain and weakness in her right

dominant arm, autonomic nervous system dysfunction, dizzy spells, lightheadedness,

---

[5]The ALJ did not make an alternative determination at step five.  Tr. at 20.

[6]Because Plaintiff's sole claim concerns her mental functional impairments, the medical summary will focus primarily on mental health records.

shortness of breath, cardiac conditions with prior heart attack and cardiac catheterization, history of deep vein thrombosis ("DVT") in her right leg, chronic swelling of her right left leg, history of pulmonary embolisms, and severe anxiety with panic attacks.  Tr. at 182.

On October 15, 2015, Plaintiff saw her treating cardiologist, Ramesh K. Adiraju, M.D.  Tr. at 408.  Dr. Adiraju noted Plaintiff's diagnoses, including a history of panic attacks with anginal symptoms.  Id.  The doctor listed Plaintiff's medications as Sectral, Ativan, Cymbalta, and a fish oil supplement for triglyceride dysfunction.  Id.[7]

On December 7, 2016, Plaintiff met with her primary treating physician Michelle Scannapieco, M.D., at St. Mary's Medical Center.  Tr. at 372-75.  Dr. Scannapieco noted Plaintiff's history of anxiety disorder.  Id. at 373.  Upon mental status examination, Plaintiff appeared active and alert; was oriented to time, place, and person; demonstrated good judgment; exhibited normal mood, affect, and attentiveness; exhibited normal thought process, recent and remote memory, and speech and comprehension; and had no personality changes.  Id. at 374.  In her assessment/plan for Plaintiff, Dr. Scannapieco's

---

[7]Sectral (generic acebutolol) is a beta-blocker used to treat hypertension and heart rhythm disorders.  See https://www.drugs.com/mtm/sectral.html (last visited Nov. 5, 2021).  Ativan (generic lorazepam) is a benzodiazepine is used to treat anxiety.  See https://www.drugs.com/lorazepam.html (last visited Nov. 5, 2021).  Cymbalta (generic duloxetine) is used to treat major depressive disorder in adults.  See https://www.drugs.com/duloxetine.html (last visited Nov. 5, 2021).

list of diagnoses included anxiety disorder, unspecified,[8] for which Plaintiff took Ativan and Cymbalta.  Id. at 375.  On May 8, 2017, during a follow-up visit, Dr. Scannapieco documented the same findings and renewed Plaintiff's medications.  Id. at 369-70.

On September 25, 2017, Plaintiff saw Dr. Scannapieco during an outpatient visit and complained of right knee swelling.  Tr. at 362.  The doctor noted that Plaintiff exhibited no psychological behavioral symptom, and a mental status examination yielded normal results.  Id. at 365.

Two days later, on September 27, 2017, Plaintiff met with George Stollsteimer, M.D., of St. Mary's Medical Center during an outpatient visit and complained of right shoulder pain.  Tr. at 322.  Dr. Stollsteimer noted Plaintiff's history of anxiety and ongoing prescriptions for duloxetine and lorazepam.  Id. at 322-23.  The doctor noted the same history and medications during a follow-up for her right shoulder pain on October 12, 2017.  Id. at 317-18.

On November 20, 2017, Plaintiff returned to Dr. Scannapieco with complaints of a swollen left knee and inquired whether any of her medications caused her to gain weight.  Tr. at 357.  Dr. Scannapieco reviewed Plaintiff's medications, including duloxetine and

---

[8]Unspecified anxiety disorder "applies to presentations in which symptoms characteristic of an anxiety disorder cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the anxiety disorders diagnostic class." Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM-5"), at 233.

lorazepam.  Id. at 357-58, 361.  Dr. Scannapieco noted that Plaintiff did not want to taper her anxiety medication because she still had occasional episodes.  Id. at 361.

On June 27, 2018, Plaintiff saw Dr. Scannapieco with chief complaints of fatigue, shortness of breath, headaches, and lightheadedness.  Tr. at 352.  Dr. Scannapieco assessed Plaintiff's behavior as depressed, hyperactive, and tearful based upon his examination, during which Plaintiff was depressed and tearful and exhibited a disoriented thought process.  Id. at 355.  Dr. Scannapieco assessed Plaintiff with various physical problems, including dyspnea, dizziness, and a disorder of the autonomic nervous system, as well as depressive disorder, single episode, unspecified.  Id. at 356.[9]  The doctor renewed Plaintiff's prescriptions for Cymbalta and lorazepam, the latter explicitly for anxiety.  Id.

On August 22, 2018, Plaintiff sought emergency room treatment for chest pain at Lower Bucks Hospital, where Erica Fine, M.D., listed Plaintiff's diagnoses as anxiety disorder, unspecified, and chest pain, unspecified.  Tr. at 504.[10]  Dr. Fine described Plaintiff's general appearance as "well nourished, alert, cooperative, no acute distress.  Very anxious and tearful," and noted Plaintiff's anxious affect during a mental status

---

[9]Unspecified depressive disorder "applies to presentations in which symptoms characteristic of a depressive disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning dominate but do not meet the full criteria for any of the disorders in the depressive disorders diagnostic class."  DSM-5 at 184.

[10]Records from Lower Bucks Hospital, see tr. at 504-30, are repeated later in the record, beginning id. at 839.  I will cite to these records using the lower pagination.

examination.  Id. at 514.  Plaintiff reported feeling better after taking Ativan, and Dr. Fine

noted treating cardiologist Dr. Adiraju's statement that "all of her presenting symptoms

have been going on for a while."  Id. at 514-15.  Dr. Fine opined that "anxiety seems to

be a huge component of [Plaintiff's] symptoms," and recommended that Plaintiff follow

up with a psychologist to pursue therapy in addition to her medications.  Id. at 515.

On November 14, 2018, consultative examiner Saeed Bazel, M.D., performed an

internal medicine examination of Plaintiff.  Tr. at 418-23.  Dr. Bazel noted that Plaintiff

had carried the diagnosis of autonomic nervous system dysfunction since reports of chest

pain in February 2007, with symptoms since that time of chest discomfort and shortness

of breath with variable blood pressure, stiff jaw, neck pain, shoulder pain,

lightheadedness, dizziness, and faintness, which usually subside after taking Ativan.  Id.

Dr. Bazel also noted that Plaintiff had been diagnosed with stress, anxiety, and panic

disorder since 2007, for which she "is under treatment and seems stable."  Id. at 419.

Plaintiff's list of medications included lansoprazole, atorvastatin, and coreg for her

diagnosed physical ailments,[11] as well as Cymbalta, and lorazepam, the latter three times

per day "for severe anxiety and chest pain."   Id. at 420.  The doctor performed a mental

status screen in which Plaintiff exhibited a depressed affect, full orientation, and no

---

[11]Lansoprazole (marketed as Prevacid) is used to treat conditions involving
excessive stomach acid.  See https://www.drugs.com/lanoprazole.html (last visited Nov.
5, 2021).  Atorvastatin (marketed as Lipitor) is used to treat high cholesterol and to lower
trigylcerides.  See https://www.drugs.com/atorvastatin.html (last visited Nov. 5, 2021).
Coreg (generic carvedilol) is a beta-blocker used to treat heart failure and hypertension.
See https://www.drugs.com/coreg.html (last visited Nov. 5, 2021).

evidence of hallucinations, delusions, impaired judgment, or significant memory impairment.  Id. at 422.  Plaintiff stated that she has had suicidal ideation for a long time, but never acted upon it.  Id.  Dr. Bazel opined that Plaintiff did not appear to be any danger to herself or others.  Id.  The doctor's diagnoses included chronic right shoulder pain, status post fracture dislocation, right upper extremity weakness, chronic low back pain, chronic bilateral knee pain and possible arthritis, coronary artery disease, hypertension, autonomic nervous system dysfunction per cardiology diagnosis, right lower leg DVT with persistent right foot edema, and depression, anxiety, and panic disorder.  Id. at 422-23.

On November 27, 2018, Salvatore Cullari, Ph.D., a state agency psychologist, completed a Psychiatric Revuew Technique as part of the medical portion of Plaintiff's initial disability determination.  Tr. at 74-76.  Dr. Cullari found that Plaintiff had mild mental functional limitations in her ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself.  Id. at 75.  Dr. Cullari opined that Plaintiff's mental health condition appeared to be non-severe.  Id

On August 15, 2019, Plaintiff was admitted to Lower Bucks Hospital due to chest pain and severe shortness of breath and palpitations, intermittent weakness, and fatigue.

Tr. at 730.  An attending physician characterized Plaintiff as tachycardic[12] and anxious, with a normal pulmonary examination, id. at 727, while a second attending physician opined that Plaintiff's anxiety was contributing to her tachycardia as she was "visibly anxious."  Id. at 731.  A CT angiogram of Plaintiff's chest did not show any sign of a pulmonary embolus.  Id. at 735.  Plaintiff was diagnosed with atrial fibrillation, and during her hospitalization received adenosine, lorazepam, and metoprolol.  Id. at 735, 746.[13]  During her hospitalization, attending physicians reiterated that Plaintiff should consider receiving a psychology consultation.  Id. at 756, 774, 785.  Plaintiff's August 19, 2019 discharge summary included instructions to continue medications including duloxetine and lorazepam.  Id. at 661-62, 798.

Dr. Adiraju's records include the results of an August 17, 2019 electrocardiogram showing that Plaintiff's left ventricular function and left ventricular ejection fraction were normal.  Tr. at 655.  Dr. Adiraju continued Plaintiff's medication regimen.  Id. at 640.

---

[12]Tachycardic is defined as having a rapid heartbeat.  Dorland's Illustrated Medical Dictionary, 32nd ed. 2012 ("DIMD"), at 1868.

[13]Atrial fibrillation is defined as a heart arrythmia that results in "a totally irregular, often rapid ventricular rate."  DIMD at 700.  Adenosine is used to help restore normal heartbeats in people with certain heart rhythm disorders.  See https://www.drugs.com/mtm/adenosine.html (last visited Nov. 5, 2021).  Metoprolol is a beta-blocker used to treat angina and hypertension.  See https://drugs.com/metroprolol.html (last visited Nov. 5, 2021).

C.    <u>Other Evidence</u>

At the September 4, 2019 administrative hearing, Plaintiff primarily testified about her physical diagnoses, including autonomic dysfunction and DVT.  <u>Tr.</u> at 39-59.  In describing a typical day, Plaintiff indicated that stress tended to trigger her physical symptoms.  <u>Id.</u> at 61.  Plaintiff testified that she sleeps a lot, does not want to go out or see people, and does not want to drive a car.  <u>Id.</u> at 61-62.  She explained that she always thinks about having a massive heart attack because that is the prognosis for someone with her conditions.  <u>Id.</u> at 62.  Plaintiff testified,

> I'm always thinking, you know, oh, is [it] gonna be today or is it gonna be later.  Is it gonna be in an hour and I'm just better off sleeping. . . .  I don't even want to leave the hospital when I'm in it.  I'd like to live there because I feel more comfortable.  They're right there.  They're right outside the room.  And if you need them, they'll save you.

<u>Id.</u>  Friends help her get to doctor appointments and shopping, or she will have her groceries delivered.  <u>Id.</u> at 63.[14]

A vocational expert ("VE") also testified at the administrative hearing.  <u>Tr.</u> at 64-69.  With respect to Plaintiff's past relevant work as a jewelry sales clerk, the VE testified

---

[14]Plaintiff's testimony is largely consistent with her Function Report.  <u>Tr.</u> at 207-16.  Plaintiff reported that she has become depressed and fearful of the onset of symptoms.  <u>Id.</u> at 208.  She indicated that "[m]ost situations have become stressful and anxiety is ever-present. . . . .  Do not want to go anywhere, see anyone, or speak to mostly everyone."  <u>Id.</u> at 213.  She described herself as "not very engaging anymore.  I avoid interactions."  <u>Id.</u> at 212.

that the position is classified as skilled[15] and light exertion, but performed by Plaintiff at

medium exertion.  Id. at 64.  The ALJ asked the VE to consider a hypothetical individual

of Plaintiff's age, education, and work experience who would be limited to light work,

and who could occasionally push and/or pull using the dominant right upper extremity,

could occasionally perform postural activities except, could not climb ladders, ropes, or

scaffolds, and could not crawl.  Id. at 65.  Furthermore, the hypothetical individual could

not reach overhead with the right upper extremity, be exposed to unprotected heights, or

operate hazardous machinery.  Id.  The VE responded that such a person could perform

Plaintiff's past work as a jewelry sales clerk if the job were performed at the light

exertional level and not at the medium level as Plaintiff performed it.  Id. at 65-66.  The

VE testified that the identified job would be eliminated if the hypothetical individual

could lift and/or carry ten pounds occasionally and lighter weights frequently, or if the

individual could stand and/or walk for only four hours in an eight-hour workday.  Id. at

66.  The ALJ did not incorporate any mental functional limitations into the hypothetical

questions.

---

[15]"Skilled work requires qualifications in which a person uses judgment to
determine the machine and manual operations to be performed in order to obtain the
proper form, quality, or quantity of material to be produced.  Skilled work may require
laying out work, estimating quality, determining the suitability and needed quantities of
materials, making precise measurements, reading blueprints or other specifications, or
making necessary computations or mechanical adjustments to control or regulate the
work.  Other skilled jobs may require dealing with people, facts, or figures or abstract
ideas at a high level of complexity."  20 C.F.R. 404.1568(c).

**D.**     **The ALJ's Consideration of Plaintiff's Mental Functional Limitations**

Plaintiff argues that remand is required because the ALJ found that Plaintiff had mild limitations related to her mental impairments at step two but failed to account for these limitations in finding at step four that Plaintiff retained the RFC to perform her skilled past relevant work as a jewelry sales clerk.  Docs. 6 & 8.  Defendant counters that substantial evidence supports the ALJ's determination that Plaintiff's mental impairments were not severe and did not result in any functional limitations.  Doc. 7.

As previously noted, the ALJ found at step two that Plaintiff's depression, anxiety, and panic disorder were non-severe.  Tr. at 13.  In making that finding, the ALJ considered the four broad areas of mental functioning set out in the regulations and known as the "paragraph B" criteria, stating:

> The first functional area is understanding, remembering, or applying information.  In this area, [Plaintiff] has a mild limitation.  [Plaintiff] obtained her high school degree.  In her function report, [Plaintiff] stated that she would be able to follow spoken and written instructions "ok".  The progress notes from Dr. Scannapieco dated June 27, 2018 show that [Plaintiff's] memory and comprehension were normal.  During the consultative internal medicine evaluation on November 14, 2018, the consultative examiner reported that there was no evidence of an impaired judgment or a significant memory impairment.
>
> The next functional area is interacting with others.  In this area, [Plaintiff] has a mild limitation.  [Plaintiff] testified that she lives alone and does not want to socialize with anyone.  In her function report, she stated that she would be able to spend time with others, but she usually avoided interaction with family and friends.  During consultative psychological

14

evaluation on November 14, 2018, the consultative examiner
reported that [Plaintiff] maintained a good eye contact.

The third functional area is concentrating, persisting, or
maintaining pace.  In this area, [Plaintiff] has a mild
limitation.  In her function report, [Plaintiff] stated that she
would be able to pay attention for only 20 minutes and she
would not be able to finish what she started.  The progress
notes from Dr. Scannapieco dated June 27, 2018 show that
[Plaintiff's] attentiveness was normal.

The fourth functional area is adapting or managing oneself.
In this area, [Plaintiff] has a mild limitation.  In her function
report, [Plaintiff] stated that she had problems with personal
care *due to physical impairments*.  She stated that she did not
handle stress or changes in the routine well.  The progress
notes from Dr. Scannapieco dated June 27, 2018 show that
[Plaintiff] was depressed and tearful and her thought process
was disordered.  However, there were no personality changes
noted.  During the consultative internal medicine evaluation
on November 14, 2018, the consultative examiner reported
that [Plaintiff] was oriented to all spheres.  She did not appear
to be in any danger to herself or others.

Id. at 13-14 (emphasis in original) (record citations omitted).   The ALJ then stated:

The limitations identified in the "paragraph B" criteria are not
a[n RFC] assessment but are used to rate the severity of
mental impairments at steps 2 and 3 of the sequential
evaluation process.  The mental [RFC] assessment used at
steps 4 and 5 of the sequential evaluation process requires a
more detailed assessment by itemizing various functions
contained in the broad categories found in paragraph B of the
adult mental disorders listings in 12.00 of the Listing of
Impairments (SSR 96-8p).  Therefore, the following [RFC]
assessment reflects the degree of limitation the undersigned
has found in the "paragraph B" mental function analysis.

Id. at 14.  As noted, the ALJ did not include any functional limitations related to

Plaintiff's non-severe mental impairments in his subsequent RFC determination, nor did

15

he include any mental functional limitations in the hypothetical questions posed to the

VE.  Id. at 15, 65-66.

The Third Circuit has explained the interplay between the Paragraph B criteria,

which is done at steps two and three of the sequential evaluation, with the later RFC

analysis, which is done at step four.

> [N]o incantations are required at steps four and five simply
> because a particular finding has been made at steps two and
> three.  Those portions of the disability analysis serve distinct
> purposes and may be expressed in different ways.  When
> mental health is at issue, the functional limitation categories
> are "used to rate the severity of mental impairment(s)[.]"
> SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996).  While
> obviously related to the limitation findings, the RFC is a
> determination of "the most [a claimant] can still do despite
> [his] limitations" "based on all the relevant evidence in [the]
> case record."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1);
> SSR 96-8p, at *2.  It "requires a more detailed assessment [of
> the areas of functional limitation] by itemizing various
> functions contained in the broad [functional limitation]
> categories[.]"  SSR 96-8p, at *4.  And, unlike the findings at
> steps two and three, the RFC "must be expressed in terms of
> work-related functions[,]" such as by describing the
> claimant's "abilities to:  understand, carry out, and remember
> instructions; use judgment in making work-related decisions;
> respond appropriately to supervision, co-workers and work
> situations; and deal with changes in a routine work setting."
> Id. at *6.  In short, the findings at steps two and three will not
> necessarily translate to the language used at steps four and
> five.

Hess v. Comm'r of Soc. Sec., 931 F.3d 198, 209 (3d Cir. 2019).  Thus, the ALJ's failure

to include limitations related to mental impairments found mild at steps two and three

does not necessarily result in error at step four.  See Brumfield v. Saul, Civ. No. 19-4555,

2020 WL 4934315, at *8 (E.D. Pa. Aug. 21, 2020) (affirming where ALJ found mild limitations in paragraph B criteria at step two and RFC assessment did not include limitations related to non-severe mental impairments).

Despite the differences between the analyses at steps two and four, the findings at step two are "plainly relevant" to the ALJ's later step four analysis because it involves 'the claimant's actual impairments.'" Brumfield, 2020 WL 4934315, at *4 (quoting Hess, 931 F.3d at 209).  The step four determination must be made after a narrative discussion that "'reflect[s] the claimant's particular impairments, including those embodied in the functional limitation findings' from the earlier steps." Id. (quoting Hess, 931 F.3d at 209).

Here, the ALJ's narrative summary of the medical record is devoted almost entirely to Plaintiff's physical impairments, see tr. at 15-19, and concludes with the following:

> With regard to the opinion evidence relating to [Plaintiff's] *mental health impairments*, the undersigned has considered the opinion of the State agency psychological consultant . . . dated November 27, 2018, who concluded that [Plaintiff's] alleged mental health impairments were non-severe.  The undersigned finds his opinion to be persuasive.  It is supported by the stable mental status findings during the consultative internal medicine examination performed by Dr. Bazel.  Further, [Plaintiff's] mental health treatment for her anxiety and depression has been conservative and routine with medications. . . .  Moreover, Dr. Scannapieco noted relatively unremarkable mental status findings during the follow up visits in 2018.  [Plaintiff] was alert and oriented to all spheres.  She had a good judgment and a normal attentiveness.  Her thought process was noted to be

17

> disordered.  However, there no personality changes.  Her
> memory, speech and comprehension were normal.

Id. at 19 (emphasis in original) (record citations omitted).

The ALJ's consideration of Plaintiff's mental limitations at step four is problematic, and is distinguishable from Hess and Brumfield.  In Hess, the ALJ's consideration of the paragraph B criteria included a finding of moderate difficulties in concentration, persistence, and pace, while the ALJ's RFC assessment limited Mr. Hess "to jobs requiring understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions."  931 F.3d at 204.  The Third Circuit approved the ALJ's RFC analysis, finding that the ALJ's reliance on Plaintiff's daily activities provided a "valid explanation" for the limitation to simple tasks.  Id. at 213-14. Here, at step two the ALJ provided explanations for why he found mild limitations in each of the paragraph B criteria, but then in his RFC analysis provided no discussion whatsoever of the impact of those mild limitations on Plaintiff's ability to perform her prior work.  Thus, whereas in Hess the ALJ found moderate difficulties arising from one of the four paragraph B criteria and limited the plaintiff to simple tasks at step four, here the ALJ found mild limitations in all four paragraph B criteria but did not include any mental health-related limitations in the RFC assessment or in the hypotheticals to the VE. This omission strongly suggests that the ALJ violated his responsibility to include in the RFC assessment limitations attributable to severe as well as non-severe impairments.  See 20 C.F.R. 404.1545(a)(2); SSR 96-8p, "Policy Interpretation Ruling Titles II and XVI:

Assessing Residual Functional Capacity in Initial Claims," 1996 WL 374184, *5 (July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'").[16]  As our sister court declared, "mild and moderate mental impairments, as opposed to no mental impairments, presumably have an impact on Plaintiff's overall RFC."  Curry v. Comm'r of Soc. Sec., Civ. No. 15-7515, 2017 WL 825196, at *5 (D.N.J. Mar. 20, 2017).[17]

In Brumfeld, as previously noted, the court found no error in the ALJ's failure to include limitations related to non-severe mental impairments in the RFC assessment despite finding mild limitations in the Paragraph B criteria at step two.  2020 WL 4934315, at *8.   However, the court characterized evidence of Brumfeld's depression and anxiety as "sparse," "limited," and "overwhelmingly normal," id. at *6, 8, and therefore found that even if the ALJ's consideration of the mild paragraph B findings at step four was incomplete, any error was harmless.  Id. at *6.  Here, Plaintiff's medical

---

[16]Similarly, a hypothetical to the VE "must reflect all of the claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (citing Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984)).

[17]In Curry, the ALJ omitted all reference to mental impairments in the RFC discussion, requiring remand.  Although the ALJ here did at least reference Plaintiff's mental impairments in the RFC discussion, the ALJ inquired only whether the impairments were severe, and thus did not consider the impact of Plaintiff's non-severe impairments.

record includes a long history of mental health-related symptomology and treatment, including long-term treatment with psychotropic medication.  This evidence includes a hospital emergency room visit in August 2018 during which Dr. Fine opined that "anxiety seems to be a huge component of [Plaintiff's] symptoms," tr. at 515, and a four-day hospitalization in August 2019 during which multiple attending physicians suggested that Plaintiff consider receiving a psychology consultation. Id. at 756, 774, 785. Significantly, these hospital visits occurred several months before and after state agency psychologist Dr. Cullari opined that Plaintiff's mental impairments were non-severe. Id. at 75.  Notes from the two hospital visits are consistent with Plaintiff's testimony regarding significant anxiety due to persistent fears of a heart attack, id. at 61-63, and with the limitations reported by Plaintiff in her Function Report. Id. at 191. Additionally, the persistent nature of Plaintiff's mental health issues was noted by consultative examiner Dr. Bazel, who indicated that Plaintiff had been diagnosed and treated for stress, anxiety, and panic disorder since 2007, reported longstanding suicidal ideation, and exhibited a depressed affect upon mental status examination. Id. at 419, 422.

It is important to note that the ALJ found at step four that Plaintiff could perform her past relevant work as a jewelry sales clerk, defined as light and skilled work, without making an alternative step-five finding of other available work that Plaintiff could perform.  This is significant because skilled work requires a higher level of mental functioning than unskilled or semi-skilled work.  Compare 20 C.F.R. 404.1568(a)

("Unskilled work is work which needs little or no judgment to do simple duties") and (b)

("Semi-skilled work is work which needs some skills but does not require doing the more

complex work duties.") with (c) (skilled work requires a high degree of judgment,

precision and/or dealing with people, facts, or figures or abstract ideas "at a high level of

complexity").  Thus, whereas non-severe mental impairments do not significantly limit a

claimant's ability to do basic work activities, see 20 C.F.R. § 404.1522(a), the ability to

perform skilled work could be affected by even non-severe mental impairments.  See,

e.g., Metelli v. Berryhill, Civ. No. 16-6094, 2017 WL 2570913, at *6 (E.D. Pa. May 26,

2017) (requirement to include limitations from non-severe mental impairments "is

especially important in cases involving claimants whose past relevant work was a skilled

occupation").  Here, it is unclear how Plaintiff could perform her prior skilled work when

she exhibits a disordered mental thought process, which Dr. Scannapieco found in her

June 2018 mental status examination and the ALJ noted twice in his opinion.  Tr. at 14,

19.  In any event, the ALJ did not make an explicit finding that Plaintiff's limitations

were so minimal that they would not limit Plaintiff's ability to perform skilled work, nor

is it clear that there is other work Plaintiff could perform given her limitations, age,

education, and work history.[18]

---

[18]Plaintiff avers that if she were limited to performing unskilled light work,
application of the Medical-Vocational Guidelines would dictate a finding of disabled.
Doc. 6 at 10.  I make no finding in this regard, but reiterate that additional vocational
testimony would be required to determine what work, if any, Plaintiff could perform in
light of the limitations caused by her severe and non-severe impairments.

For the foregoing reasons, I conclude that the ALJ's step four decision is not supported by substantial evidence.  I will remand for further consideration as to whether the mild limitations identified as part of the paragraph B criteria at step two cause any limitations in Plaintiff's ability to perform skilled work at step four, and whether these limitations, in combination with the other limitations found by the ALJ, would impact Plaintiff's ability to perform her prior relevant work or any other work.

## IV.   <u>CONCLUSION</u>

The ALJ did not properly consider Plaintiff's mental functional limitations, requiring reconsideration of Plaintiff's RFC, which in turn impacts a determination regarding Plaintiff's ability to perform work at steps four and/or five.  Therefore, I will remand the case for further consideration and additional vocational testimony.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WENDY LEICHTER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  20-6147 |
| Commissioner of Social Security | : | |

## **O R D E R**

AND NOW, this 13th day of December 2021, upon consideration of Plaintiff's

request for review (Doc. 6), Defendant's response (Doc. 7), and Plaintiff's reply (Doc. 8),

and after careful consideration of the administrative record (Doc. 5), IT IS HEREBY

ORDERED that:

1.  Judgment is entered REVERSING the decision of the Commissioner of
    Social Security for the purposes of this remand only and the relief sought
    by Plaintiff is GRANTED to the extent that the matter is REMANDED for
    further proceedings consistent with this adjudication; and

2.  The Clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

/s/ ELIZABETH T. HEY

_____

ELIZABETH T. HEY, U.S.M.J.